The second case is Mr. Cibulka v. City of Madison. Mr. Porter? Thank you, Your Honor. If he's the court, my name is Steve Porter, and I represent Todd and Shelly Cibulka who are here with me in my office. You can see them on the screen behind me. Neither Seventh Circuit case law nor Wisconsin case law has extended the community caretaker exception to the Fourth Amendment probable cause requirement to allow for forcible detention of a subject of a welfare check without probable cause to believe the subject is incapacitated or presents a danger to himself or others. In this case, the defendant police officer grabbed Todd Cibulka, forcibly took him to the ground, handcuffed his hands behind his back, and tried to force him into a squad car, then ultimately arrested him, placed him hogtied into a police van and took him to the Dane County Jail because he had stood up and taken a few steps and passively resisted police officers who were trying to get him to sit down again during a welfare check into his apparently intoxicated condition. At no time did the police officers have a reasonable basis to believe that Todd was incapacitated or a danger to himself or others. What defendants in the district court described as a welfare check did not end up promoting Todd Cibulka's welfare in the least. It commenced with the concern that Todd and Shelly might be too intoxicated to walk with their daughter to their car and have her drive them home. It took Todd several hours, sitting in his own excrement, and then released to drive himself home alone while probably still under the influence of alcohol. The question of reasonableness of the police officers' exercise of their community welfare function should have been a question to be resolved at trial by a jury. The question of whether Todd Cibulka presented a danger to himself or others is a question of fact that also should have been left to the jury to decide. Viewing all of the evidence in the light most favorable to Todd makes it abundantly clear that a reasonable jury could have easily concluded that if the officers had simply left the Cibulkas alone, they would have made it to their car on foot without incident. Maybe not as quick as their daughter Emily wanted, but they would have made it, and she would have driven them home safely. Didn't Emily start the whole thing? Yes, she did. She was a freshman at the university and just very anxious about her parents. Her parents had come down to a Badger football game. Todd himself is an alumnus. I don't know if Shelly is, but they were kind of reliving their college days and had gone to a football game to meet their daughter and their daughter. How long were they at the tavern? As far as I know, they were at the tavern for several hours. I believe they left the football game a little bit early, went to a tavern within a few blocks of the game and of the stadium and then were there. Finally, Emily came to collect them after several hours of drinking at the tavern. But they were on foot and they were about 12 blocks from where their car was parked in a ramp near the state capitol. And they were walking along, just they seemed to be meandering, taking their time. They didn't feel the sense of urgency that Emily apparently felt about getting to the car and getting home. They'd had a few drinks. They were intoxicated, but they were not incapacitated. And there's no reason to believe that they could not have successfully negotiated the distance on foot to get in their car. And Emily was going to drive them home. There was no danger. It presented no danger to the public because of their intoxication. And she called the police. She had called a taxi or an Uber and it arrived and Todd and Shelley refused to get in. They said they wanted to walk. That made her upset. I can't remember now if she might have called a second cab, but in any event, she finally called the police because she believed in her young mind that the police would give them a ride to their car and sort of compel their parents, her parents to get to go with them to the car. That, however, is not... There was a truck and he refused to give her the keys, right? You know, I'm not sure of that, Your Honor. That's a fact that I can't confirm. I'm not sure what the record says about that. But they were more than 12 blocks from the car and it was understood between all of them that Emily would be driving home. And it's certainly the welfare check and the circumstances that the police encountered really had nothing to do with the keys at all. What it had to do with, I think, was primarily some officers who kind of bought into Emily's concern at the expense of my client's liberty interest and their right to determine their own welfare unless they were incapacitated from being able to do so. Anybody who's been to a Badger football game and been around the vicinity of the stadium within a several blocks after a football game has certainly seen people with levels of intoxication a lot greater than that of the Sevalkas at the time. And they were sitting... When the police arrived, they were sitting quietly on a... You know, the university buildings are set back far from the sidewalk. It's 25 or 30 feet wide. And along the front of one of the buildings was a little ledge or a little wall, retaining wall, that was about two feet high. And the Sevalkas were sitting on that at the time quietly. When the police arrived, you can see that in the video that's in the record. Did I go back to the situation Emily called the police? Otherwise, they wouldn't have been there. Correct. That's correct, Your Honor. And so the police came and, you know, Officer Irwin sort of bantered with Todd primarily for about 10 minutes, just talking about the game and talking about the university and asking him, you know, occasionally you know where your car is. And Todd said, yeah, it's up over that way. And Todd had been a student at the university. He knew where his car was. He didn't give the police officer the precise location or the address, but there's no reason to believe that they wouldn't have found the car in the parking ramp. And after about 10 minutes, he stood up for whatever reason, probably because he had been sitting for 10 minutes or more on a very hard cement retainer wall. And in doing so, he stood up rather quickly. And you can see from the video, he was a little bit off balance and he kind of took two steps towards the center of the sidewalk. And it where he encountered Officer Irwin, who sort of stopped him at that point. He almost fell into the street, didn't he? Well, that's what the police allege, but that's a contested issue of fact, your honor. The sidewalk was 25 feet wide. If he took two steps in that direction, assuming even as a big guy that his steps were three or four feet each, that would easily leave 15 to 20 feet at minimum between him and West Johnson Street. And once he was stabilized by the officer, there was no danger of him falling into the street. And there's absolutely no evidence to conclude that he was going to willfully dart into the street, which is what Officer Irwin suspected, at least he claims he suspected. And the whole, the end of the welfare check basically happened when Officer Irwin refused to let go of Todd. And Todd tried to pull away and said, well, it was like this and tries to get free and says, and the officers then trying to get him to sit down and Todd says, I don't want to sit down. I'm good. Todd was ready to leave. As a free individual, he was ready to leave. And the court, the district court observed that when Emily asked Officer Rivera, city of Madison police defendant, you know, can you make my clients get in your car and go with us? He said, no, they're free to leave whenever they want. And that's what the law is. They knew what the law is. You can talk about qualified immunity all you want. They knew my clients were free to leave at that point, unless they had probable cause to arrest them, or they had probable cause to leave that they were incapacitated and unable to take care of themselves. But this police officers, I remember the term from law school, vicious internatally. And that's what it reminds me of. I'm sure these officers had the best intentions in mind, but they decided that they knew better than Todd, what is, what is welfare required. And they decided that, that his liberty didn't matter, that they were going to, in a typical police fashion, you know, once you, once you, they think they know what they want to tell you what to do, and you don't necessarily want to do it immediately that the police are trained to start to, to apply the next level of force of the continuation of force continuum. And you say the next level of force, it seems to me this was, this was sort of a progressive encounter, wasn't it? I mean, at first it was, Todd stumbled, the officers stabilized him. Yeah, that makes sense. Then he wouldn't let go. And Todd said, you know, let go. And he sort of struggled to pull back. He never actively resisted the officer. He only tried to pull away from the officer. And when- But Emily said they're helping you, dad, didn't she? Yeah. And, and Shelly's response was, I don't think so. You know, again, it's, it's, it's a question, you know, it's not a question of the officer's motivation here. I'm not impugning their good intentions. It's a question of their objective reasonableness of their actions. And, and they, they, you know, once it became clear that Irwin and, and Todd were kind of pulling a little bit against each other, Rivera comes over and, and the other officer and, and they all get tangled up. And either they fell to the ground or they actually, I think there's a, the jury could conclude that the officers intended to take them down to the ground. And they, they had him on his stomach. They pulled, they struggled to get his hands behind his back and they handcuffed him. And then they stood him up and tried to, tried to force him to get into a squad car. And they claim, you know, their, their position at that time was that he wasn't under arrest. They didn't have probable cause to believe a crime had occurred. And, and they're basically trying to stuff him in a squad car. And, and Todd's resisting that because he, he figures, you know, what, where are they going to take me? What are they going to do to me? You know, and, and, and essentially our, our theory of the case is they just simply had no doing that. A welfare check, like a, a, a Terry stock is supposed to be designed to be as unobtrusive as possible and to, and to take as minimal amount of time as possible. They had, they had over 10 minutes talking to the, to the Sebokas. And while there's no doubt that, that, that the Sebokas, it was apparent they had been drinking. You might even call them intoxicated. In my view, I think in the view of the evidence and a view that a reasonable jury could conclude that there's no evidence that they could not have simply made, negotiated the walk of 12 blocks up to their car. And if they, I keep coming back, I keep coming back to Emily. She said she'd never saw them this bad before. This was very unusual for her parents. And she's the one that called the police twice. And then they come up and this just seems to be a progressive, unfortunate evolution until you get to where he doesn't want to get in the car or get up or down or anything else. It's, it's unfortunate. The district court went through the whole thing and that's where we are. That's correct, your honor. And, and it's our contention that that was a violation of the, of Todd Sebokas' right to, to remain free of, of police interference and police intrusion into his liberty. And, you know, whether, whether under the criminal law or under the community welfare check exception to the fourth could say that the police interference with Todd Sebokas' freedom benefited his welfare in any way. At a certain point it's, it behooves the police to say unless they can make a determination. And Wisconsin of course has the, has chapter 51 that sets out a very detailed procedure for someone who is incapacitated or, or a danger to themselves or others. And the police, the record indicates the police never made that determination in this case. And, you know, Wisconsin did away with, with the crime of public intoxication in the mid seventies. So there's no question of the lawfulness of the, of the Sebokas' behavior. And, and, and whether the police thought that, that, that Emily's concerns were something they needed to respond to or not, the Sebokas as free people had no, no requirement to do what their daughter wanted them to do. And, and they certainly had, when officer Irwin ordered Todd Sebokas to sit down, there was no basis that was an unreasonable order. And he had no, Todd Sebokas had every right to say, I don't want to sit down. I want to move on now. And, and I think that- Is that the first contact when they wanted, wanted to sit down is basically the first, what's the first contact? First contact when Todd stood up. That you're, that you're, that you're challenging. Because there was a point when Emily called them and they were okay. When you put their hands up where he might be sort of falling down, he's 6'3 and 250. I think the cop was pretty short, wasn't he? Yes, he was judge. And, and you know, you were, I mean, Todd's a middle-aged man. You can see him behind me. And when you sit on a, it's October in Wisconsin. And when you sit on a cement retaining wall for 10 minutes, they've been sitting there before the police arrived. So maybe 15, 20 minutes, you know, that, that gets to your, to your very air and, and you want to stand up. But maybe sometimes at our age, when you stand up, you know, you're, you don't, your legs don't function like they do when you're 20 and you're 18, like Emily. And, or even when you're a police officer, like Officer Irwin, and he stumbled and Officer Irwin appropriately checked him and stabilized him. Mr. Porter, Mr. Porter, does the record reflect that Emily told the police officers at any point that she would be driving her parents home? Yes. At what point, at what point did she inform the officers that she would be the driver? When Officer Irwin was talking to the Sebalcas, Officer Rivera was talking to Emily and her friend. And I believe that that was the point that, that that information was communicated to Officer Rivera. But, but she was refused the keys, right? Her dad wouldn't give her the keys. You know, again, Your Honor, I apologize. That's not a fact that I can confirm or deny, but I, I would submit that it was not a critical issue to any decision that the police made to restrain or detain or arrest Todd Sebalcas. Well, Mr. Porter, if that's a matter of some dispute of whether or not Emily would be the driver, is there some concern on the behalf, reasonable concern on behalf of the officers about who would be driving home? And I'm speaking now as to the community, you know, the caretaking aspect of this case. Yes, I understand your question, Your Honor. And, and all I can tell you is that it's my understanding that there's no dispute in the record and that it was understood between all of the Sebalcas that Emily would be driving them home. I mean, if there is some kind of it certainly wasn't established in the record to justify a summary judgment against my clients. Well, but you're, you're sure that she made it clear to the officers. You're, you, you are representing to us that she said that she would be the driver. Yes. But you're not sure about the keys. Is that right? You know, to be honest with you, that's the first, you're raising that question is the first time that, that the keys have come to my attention. I, you know, I was not the lawyer at the district court and I may not have all of the incidental details of the cases under my command to the degree that, that the lawyers. I understand. Thank you. I see my time is up. All right. Thank you, counsel. Uh, Mr. Thank you, your honor. Good morning. And may it please the court. I am Wisconsin assistant attorney general, Hannah jurors. And it is my great privilege to appear before the court this morning on behalf of the university of Wisconsin police officers. There are two paths. This court could take to resolve this case. Both lead to affirming the district court's decision. This morning, I'll first address the simpler path and then address why this court should consider taking the longer one. But before I turn to either path, I'd like to first address some of the factual questions that your honor have asked. Uh, your honors have asked, um, Miss, uh, the sub book is suggest today that they had only consumed a few drinks. Uh, and that this was sort of a, uh, a relaxed encounter. And I think that is just contrary to the record. That's before the court and undisputed facts. Um, the record below reflects that the sub book is, uh, Mr. Sebulka had several drinks at the bar over the period of hours when they were there as to the keys. It is in the record that Emily Sebulka told the police that her father had refused to give her the keys to the car. That is, um, you can listen to that on the audio. It is docket 48, exhibit 501. And, um, it is between, uh, minutes, 5 39 and roughly 6 35, where Emily is, you can hear that she is distraught. She is crying and she explains to her, uh, to the officers and that's officer Johnson at the time that, um, her father would not give her the keys to the truck. Um, and so returning to the past, this court could take the easiest path, uh, would be for this court to do as the district court did and recognize that qualified immunity shields the defendants here from the claims that the Sebulka's have renewed on appeal before this court. The Sebulka's really haven't even attempted to meet their burden to show that any reasonable officer in the state of Wisconsin in October of 2015 would have known that the actions here were unlawful. Um, and they can't meet this burden. And while there are many ways for this court to see that perhaps the easiest is for this court to consider the Wisconsin Supreme court's 2001 decision in the Kelsey CR case where the Wisconsin Supreme court held that the community caretaker doctrine permitted police to order a young lady to stay put on when she was on the street and they were concerned about her safety for the police to then chase that young lady when she did not stay put and for the police to then physically seize her when they caught her. And so I think when you look at that case, in addition to many other cases from Wisconsin, where our courts have interpreted the community caretaker doctrine broadly, there is simply no way for the Sebulka's to show that any reasonable officer would have known these actions were as it relates to qualified immunity. The Sebulka seem to argue that because there is not a previous Wisconsin case with precisely these types of restraints in precisely these circumstances, that that means that qualified immunity should not apply, but that flips the standard. They have the burden to show that it was essentially settled law that this type of action and these types of restraints were unlawful. And here I would encourage the court to consider its 2014 decision in the Sutterfield case. There, this court recognized that qualified immunity shielded Milwaukee police officers who, after entering the home of a suicidal woman without a warrant, then proceeded to search a closed container in her home. And this court noted that it could not find any previous Wisconsin cases where the Wisconsin courts had applied the community caretaker doctrine to allow the search of a container. But this court nevertheless recognized that given the breadth of Wisconsin's community caretaker doctrine, a reasonable officer could have believed that that action, excuse me, was lawful. This court, the same should be true here, particularly given that the police used no proactive force. Indeed, as the Sebulkas recognized, the police did not even touch Mr. Sebulka until he stood up and stumbled and Officer Irwin was concerned he might fall into the street. And from that point forward, the police did only reacted to Mr. Sebulka's refusal to listen to their calm instructions and only imposed additional restraints in response to Mr. Sebulka himself essentially turning up the volume. So the district court here provided a detailed, thorough, thoughtful, qualified immunity analysis. And this court could very fairly start and end its decision there with qualified immunity. Does that mean that we can step aside from the community caretaker law or provision? Because that seems to be what goes through this whole evolution of this case is supposedly, are we changing the law or adding a lot to the law under community caretaker? Or should we follow your advice and deal with it with whatever standard? Because it's the community caretaker that seems to be the law or provision that has brought this case forward. Yes, Your Honor. So this court could easily resolve of the case on qualified immunity grounds, but it should also consider going that next step forward. And as we've argued, affirmatively recognizing that the Fourth Amendment permits police to, or permits application of the community caretaker doctrine in circumstances like these, where a person's intoxication in public has rendered them in need of assistance. And I think perhaps the best way to see why the community caretaker doctrine should apply in such circumstances is to pose the question that the Eighth Circuit and the Wisconsin Supreme Court have posed in community caretaker analyses. And that's to ask, would we as a society view it as reasonable if the police did not act in these circumstances, or would we view police as being derelict in their duty for not acting? So if police see someone apparently intoxicated, stumbling, and at risk of falling into traffic, and they do nothing, would we consider that reasonable? If police see someone who is slumped over on a public street, apparently passed out from intoxication, and police do nothing, would we view that as reasonable? Of course not. We expect police to help, to protect, to engage in a community caretaker function. And if we all agree that police, we expect police to act in these circumstances, then they must be able to actually act. And of course, intoxicated individuals are not necessarily going to be the most logical, or accommodating, or appreciative, even when police are trying to help. And I think importantly here, recognizing that the community caretaker doctrine may apply in such circumstances doesn't mean it always will. And it's not some green light for police to seize any person who might be intoxicated on a public street. Rather, we're talking about circumstances like this, where a person's intoxication is to a point that it has rendered them in need of assistance. And I think when we also look to circuits where courts have recognized the application of the community caretaker doctrine to public intoxication circumstances, the Tenth Circuit in the Garner case, for example, we see that those courts have articulated tests that help ensure the reasonableness balancing that the Fourth Amendment always requires to make sure that this is not abused, essentially, by police. And I think this case in particular shows why it's very important for this court to consider taking that longer path and affirmatively recognizing the community caretaker doctrines application here. Well, you say a longer path, which is the only thing that I'm curious about, because I think before this case, at least, that the community caretaker was kind of confined to the home, wasn't it, where the issues, as opposed to something as far away from that, based on the circumstances of this case. This is new law, it would seem to me. This would be new law in this circuit, Your Honor, yes. Prior to this decision, this court has only recognized application of the doctrine in the context of vehicles, specifically vehicle impoundment. Vehicles as opposed to home, I misspoke then. That's the previous use of this provision. Yes, Your Honor. As a vehicle search, okay. Yes, Your Honor, but I think when we consider the nature of the analysis of vehicles versus home, and the reason why this court would say it is applicable in the vehicle context, but not the home, I think we can see that public intoxication much more closely aligns with the vehicle context. And that's because we expect police to be keeping our highways safe. By the same token, we expect police to be keeping our streets safe. Individuals have reduced privacy expectations on highways because they're public. The same is true of public streets. All of that, of course, is not true of the home, which is the primary entity protected by the Fourth Amendment. Ms. Juris, this is Judge Fong. Before we consider taking the step that you advance, we consider, and there are obviously concerns about how broad an opening this would be to possible police abuse. Do we have a situation here where the police officers developed, in their mind, a reasonable suspicion during the pushback, let me describe that encounter initially as Mr. Porter presented it, of a possibility of disorderly conduct rather than moving from community care? If we do enter that arena, does that preclude going any further? If they had that reasonable  I don't think so, Your Honor. I don't think that's a possibility, but is that a possibility that we're in disorderly conduct land, and then the officers' actions are more justified? Your Honor, I see that my time has expired. May I respond to your question? Certainly. Answer Judge Fong's question. Thank you. Yes, Your Honor, this court could alternatively recognize that essentially from the time that Mr. Sebulka begins to physically resist as the officers are attempting to help him, and that occurs right after Officer Irwin has grabbed him, asked him to sit down. He's not sitting down. Instead, he's refusing, and he starts pushing away from the officers. At that point, the police have reasonable suspicion to believe he's engaged in disorderly conduct. So, yes, that would provide from that point forward an alternate basis for the reasonableness of law enforcement's action here. Thank you. Thank you. Thank you. Mr. Sparks? Thank you, Your Honor. Good morning, and may it please the court. I have the privilege of The entirety of Hector Rivera's conduct for purposes of appeal occurred after Officer Rivera's interview with Emily Sebulka was interrupted when he observed other officers going hands-on and giving verbal commands to Todd Sebulka. His intoxicated demeanor and active resistance led Officer Rivera to believe that there was an immediate risk to officer safety. First, Officer Rivera's minimal use of force in joining other officers and placing hands on Sebulka's torso, back, and upper legs was an objectively reasonable response to what Officer Rivera perceived to be an escalating and immediate risk to the officers physically struggling with Mr. Sebulka. An immediate risk to officer safety, as the court knows, is a quintessential consideration in the Graham v. Connor analysis under the Fourth Amendment. You know, I don't know why, but your voice isn't loud enough for me. I apologize, Your Honor. Can you hear me okay now? Well, maybe it's we're distanced from a microphone or something. Sure. Everything else I've heard very well. For some reason, your voice doesn't have enough volume in it. Not my GB, but your voice, whatever device we're listening through. Understood, Your Honor. I'll try and project a little bit better. Is this better? Okay, that's a little better. All right. Officer Rivera's perception of the immediate risk to officer safety was based on his sudden observation of Mr. Sebulka's non-compliance with verbal commands, an officer going hands-on, Mr. Sebulka's body language, and the other officer's reactions to his body language. Second, after officers decentralized Mr. Sebulka, Officer Rivera's minimal use of force in securing Mr. Sebulka's legs while other officers handcuffed him was an objectively reasonable response to what Officer Rivera believed to be continued active resistance and a risk to officer safety. After he was decentralized and fell on top of Officer Rivera, Mr. Sebulka continued to actively resist officers, which, of course, is another hallmark consideration under Graham. Mr. Sebulka's active resistance on the ground continued to pose a risk to officer safety, and Officer Rivera was at that point experiencing the risk of officer safety firsthand, which justified— I can hear you very well. Okay. For whatever reason. Go ahead. Which justified his use of force when he got out from under Mr. Sebulka and secured his legs. Officer Rivera was not required to wait for a full-on altercation before using these two measured reactionary force techniques, which are his only uses of force challenged on appeal. As one panel member of this court wrote in Fitzgerald v. Santoro 707 F. 3rd 725, the police need not stand by when violence erupts and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order. The only other challenged conduct—challenged act of Officer Rivera on appeal is his decision to arrest Mr. Sebulka for disorderly conduct and resisting an officer, for which probable cause arose at the moment Officer Rivera perceived the encounter as escalating from a pure welfare check into an altercation between a heavily intoxicated subject and other officers. When Mr. Sebulka began physically struggling and not complying with Officer Irwin on a busy public sidewalk in front of his daughter, who had already expressed nervousness and being upset about his conduct, Officer Rivera could have believed that probable cause existed to arrest Mr. Sebulka for disorderly conduct. As more officers necessarily became involved and Mr. Sebulka's act of resistance continued, Officer Rivera again could have believed that there was probable cause to arrest for disorderly conduct. When Mr. Sebulka continued to resist after he was decentralized, then Officer Rivera could have believed that there was probable cause to arrest for resisting. Certainly by the time Mr. Sebulka was informed that he was under arrest while standing outside of a squad car that he refused to enter, Officer Rivera could have for disorderly conduct and resisting arrest. As the night went on, probable cause for both crimes continued. Even if Officer Rivera was mistaken in his initial analysis of Mr. Sebulka's physical encounter with Officer Irwin, that mistake was reasonable in light of the totality of the circumstances known to Officer Rivera, such that he's entitled to qualified immunity for the intoxicated. Emily Sebulka called the police due to his intoxication. Mr. Sebulka had not been cooperating with Emily. Mr. Sebulka was not helping officers locate his vehicle. Mr. Sebulka actively resisted and refused to comply with the officers from the moment he stood up and hands were placed on him. Qualified immunity is designed to protect officers like Officer Rivera for reasonable mistakes they make in evaluating dynamic situations like this, where officer safety quickly becomes a paramount consideration of an investigation. There's one note on the record that I'd also like to just bring up for the court. Counsel for the appellants noted that Officer Rivera told Emily Sebulka that her parents were, quote, unquote, free to leave. And although that statement was made to Emily Sebulka, that actually was not by Officer Rivera during their dialogue and conversation. That was made by Officer Johnson, one of the UW police officers. And that citation can be found at docket number 84, paragraph 48, docket number 96, and paragraph 48. So on behalf of Hector Rivera, I thank the court for its time and consideration. And I respectfully ask that the court affirm the district court's decision granting summary judgment and dismissing this action. Of course, I'm happy to answer any questions the court may have, but I'll leave the rest of my time for the court. Thank you. As the time went on in the process, was there a point in the encounter where it rose to a higher level where it opens up qualified immunity? Or is it just the whole sequence that packaged together gets into that issue? Thank you, Your Honor. I believe it was the whole sequence, particularly because of the perspective from which Officer Rivera first became engaged physically with Mr. Sebulka. So unlike Officer Irwin's perspective, where he was standing in front of Mr. Sebulka and saw him stumble, Officer Rivera became aware of the physical encounter while he was talking to Sebulka. So the potential for a reasonable mistake about the circumstances could have started right then and there simply because Officer Rivera's attention was focused on the person who had called the police and not behind him with Mr. Sebulka. Thank you. Mr. Porter, I think your time has expired and I'll give you another minute if you have anything else you want to add. You've got to turn your sound on. It's still not on. All right. Thank you, Your Honor. I greatly appreciate that. I think what I want to emphasize here is that neither the Seventh Circuit case law, certainly, but even the Wisconsin case law, the community caretaker exception, the probable cause requirement, permits the forcible detention of an adult unless there's probable cause to believe that the subject is incapacitated or presents a danger to himself or others. That's recognized in all of the cases if you track through them. The only exception is the Kelsey C.R. case that the University of Wisconsin has to hang on to, but that was a juvenile. The decision in that case specifically emphasized that the decision was based on the fact that Kelsey C.R. was a juvenile, might be a runaway, was out at night in a dangerous neighborhood and might be in danger. Todd Sebulka and Shelly Sebulka are adults. They're not minors. They have the right to leave with the parting comment that if the district court's logic is accepted, the combination of the community caretaker function as explained, as applied in this case, combined with qualifiability immunity, effectively swallows the Fourth Amendment. If you can say that police officers might have reasonably concluded this or might have reasonably concluded that because Emily was upset or because Todd wouldn't do exactly what they told him to do, then the burdens on summary judgment of the presumption of the facts and the inferences to be drawn for the plaintiff just completely disappear. I would submit that whether it was understands, which is the Sebulkas are free to leave whenever they want to, unless we have probable cause to believe that we have the right to interfere with them. That would take the probable cause of a crime committed, which didn't happen, if it ever did, until the police themselves provoked it by grabbing Todd Sebulka, or unless there was probable cause to believe that the Sebulkas were so incapacitated that they couldn't take care of themselves as free citizens walking down the street. And that's the essence of the case. Thank you so much. Thanks to all counsel and the case will be taken under advisement and the court will be in recess for 10 minutes.